FOUCHE, assignee, *vs.* BROWER.

[This case was argued at the last term, and the decision reserved.]

1. A creditor who has been defrauded by misrepresentations of the real capital of a bank has his remedy in an action of tort against all who participated in the fraud, but the wrong done him cannot entitle the entire body of creditors, who have not suffered from the alleged fraud, to recover of the entire body of stockholders who have taken no part in it. Each case stands, in this respect, upon its own particular circumstances; and it is essential to an action on account of the wilful misrepresentation of a fact made to induce a party to act, that he should have acted on it to his injury.

(a.) Even where the suit is prosecuted for creditors by a receiver, acting under appointment of the court, it is essential that the pleadings should set forth the facts entitling each of the creditors to maintain his action.

(b.) Creditors are a favored class, and courts will always lend them aid, and will afford them every facility and remedy to detect, defeat and annul every effort to defraud them of their just rights.

2. A bank has much the same rights to make an assignment that others have. Whenever it surrenders its charter, or the use thereof, it may make in good faith an assignment of all its effects for the payment of its debts, as natural persons may, but it cannot thereby prevent such preference among its creditors as the law gives; nor can a natural person do so.

(a.) If such an assignment was valid when made, it will not fail for the want of an assignee; but the court, in vacation or term time, is authorized to appoint a receiver, who shall execute the assignment. When appointed, he has all the rights, privileges and powers of the assignee, but none others.

3. A corporation can only act by and through its members and appointed agents. Their action is necessarily its action, and an attempt to separate the two and hold the bank to be the victim of the fraud of the members of the corporation and owners of the property, and to relieve it from responsibility for their actions, is impracticable.

4. At common law, or without special statutory authority, a voluntary assignee cannot maintain suits for the benefit of creditors, for whom he holds in trust the effects assigned, which the assignor could not have maintained; and there is no such authority in this state.

(a.) If any such inference can be drawn from the act requiring a sworn schedule to be attached to the assignment, it was passed

subsequently to the execution of this assignment, and therefore is not applicable to it.

(b.) The assignee having no power to assert a right or title with which the assignor had parted prior to the execution of his deed, neither has his successor in the assignment such power, although appointed by the court.

(c.) The sections of the Code regulating the collection and distribution of the assets of a bank by a receiver appointed upon a judgment forfeiting its charter, do not apply in the case of a voluntary assignment by the bank of its assets to pay its debts according to the requirements of law.

5. Parties who have combined to defraud others cannot invoke the aid of a court to enable them either to enforce or to rescind such an arrangement, nor can a voluntary assignee to pay debts or the successor of such assignee do so.

(a.) Suggestions as to the powers which might properly be given to assignees, executors and administrators as to cases of fraud by their assignors or decedents.

(b.) The verdict sought to be set aside could not have been other than it was.

January 6, 1885.

Corporations. Fraud. Assignments. Receiver. Debtor and Creditor. Banks. Stock and Stockholders. Torts. Actions. Verdict. Before Judge BRANHAM. Floyd Superior Court. September Adjourned Term, 1883

Fouche, assignee of the Bank of Rome, filed his bill against Brower, alleging, in brief, as follows: On March 2, 1874, the Bank of Rome was chartered, and organized with a paid-up capital of $50,000.00, divided into one thousand shares. About February 1, 1879, Brower became the owner of all of the stock; and on February 20, 1879, he transferred all of this stock to Frost, Samuel & Co. for $7,600.00; and simultaneously with the transfer, without consideration, that firm conveyed to Brower all of the property and assets of the bank, except the banking house, and he converted these assets to his own use, amounting to $40,000.00. They consisted of certain stocks, bonds, mortgages and personalty, a note and account due by himself, amounting to $12,000.00, a note of J. & S.

Bones & Co. for about $7,000.00, and certain real estate. To the real estate Brower has taken deeds in his own name, and the stock also stands in his name; but all having been paid for with assets of the bank, a trust resulted in its favor. The money for which Brower owed the bank was used in improving some of the land; the Bones note was secured by a mortgage which was foreclosed and Brower bid in the property. The arrangement between Brower and Frost, Samuel & Co. was a fraudulent device to transfer to that firm the bank stock, and clothe them with the franchise, name and charter of the bank, denuded of its capital and assets, and induce the public to make deposits and deal with and credit the bank; and all of this was known to Brower. Frost, Samuel, & Co. were and are insolvent and non residents, and never could or intended to pay for the thousand shares of stock transferred to them, or to replace the assets conveyed to Brower and converted by him with full knowledge of the facts. On February 20, 1879, Frost, Samuel & Co., with the knowledge of Brower, elected themselves officers of the bank, and in its name notified the public that they had purchased it; that it had a paid-up capital of $50,000.00 and increased facilities for business, and invited public patronage, when, in fact, all of the assets had been abstracted and turned over to Brower. They did an extensive business, received on deposit $100,000.00, and became indebted to customers $20,000.00 otherwise; of the amount deposited, they fraudulently appropriated to their own use $75,000 00. Having no capital, the bank failed, and assigned to J. H. Reynolds on March 25, 1881. He resigned, and complainant was appointed to succeed him. The prayer was for an accounting by Brower; that he be required to deliver up and transfer the property received by him as above stated; for general relief and subpœna. Discovery was waived.

The answer gave the following account of the transfer to Frost, Samuel & Co.: About February 1, 1879, defend-

ant became sole owner of all the shares in the bank, and was proceeding to wind it up; he issued a circular notifying the public of this intention, and a copy was sent to all his customers, and one to the governor. Thus all the assets became the sole and exclusive property of defendant. About February 20, 1879, Frost, Samuel & Co., with a view to continuing business in the name of the bank and under its charter, bought from defendant the bank building for $———, which they paid in full. Having no further use for the charter of the bank, and to accommodate them, without any consideration at all, he transferred all the stock and charter to them. The firm represented to him that they would increase the capital and do a large business. At the time of the transfer to the firm, defendant merely retained what was his own, and took a paper from them for the purpose of showing that it was not transferred. The firm re-organized the bank, and began business, but defendant does not know how much capital they put into it. He published a notice of the transfer of his stock, as required by law. After the sale of the building and transfer of the stock, defendant had no interest in the bank; had nothing to do with the re-organization on the 20th of February, 1879; does not know how much capital was paid into the bank, or whether any sum was paid in; nor does he know how the stock was divided. When he sold the building and transferred the stock, he had nothing more to do with the bank, and knew nothing more about its operations.

It is unnecessary to set out all the evidence in detail, but the following will serve to explain the questions at issue:

Complainant introduced the following contract:

"It is agreed by and between A. Thew H. Brower, of the first part, and E. D. Frost, R. G. Houston and C. G. Samuel, composing the firm of Frost, Samuel & Co., that in part payment for the whole of the capital stock of the Bank of Rome, consisting of one thousand shares, this day sold by said A. Thew H. Brower to said Frost, Samuel & Co.; he, the said Brower, shall retain, and the said Frost, Samuel &

Co. do hereby transfer and assign to him the stock of the bank in the East Rome Town Company; also certain Rome city bonds which were the property of said bank, .together with the bills receivable, mortgages, books of account and choses in action held by and due to said bank; also the iron safe now in use in said bank, together with two desks, one rocking and one desk chair, four spittoons, one door mat, and such other articles as are usually designated as bank tools, consisting of rules, inkstands, paper-weights, etc.; and it is further agreed that the said A. Thew H. Brower shall have the right to use the name of the bank, so far as it may be necessary to bring pending litigation to a final settlement, he holding the bank harmless on account of the same.  February 20, 1879.                    FROST, SAMUEL & Co.
Witness: W. S. COTHRAN, Notary Public.''

Also the minutes of the bank, showing that Brower was elected president on January 13, 1879, and that on February 20, 1879, all of the stock being represented in person or by proxy (C. G. Samuel and J. S. Panchen casting the vote), an election was held for a board of directors, and Samuel, Frost, Houston and Panchen were elected.

Following these proceedings on the minutes was the following circular:

"THE BANK OF ROME, CHARTERED 1874, capital $50,000.
.                         ROME, GA., February 20th, 1879.

DEAR SIR—We beg to inform you that we have purchased the entire franchise and property of the Bank of Rome, of this city, and have re-organized upon a basis which affords ample facilities for. doing a leading banking business in all its branches.

The business of the banking firm of Frost & Panchen has also been merged with the above. We have reliable correspondents at all accessible points, and make no charge for collections when drawn 'with exchange.' We refer to our New York correspondent, the National Park Bank, and pledge our prompt and faithful attention to all business entrusted to our care. Respectfully,

                                   C. G SAMUEL, President.
E. D. FROST, Vice-President.

                           J. S. PANCHEN, Cashier.''

The other evidence showed as follows: Brower transferred the stock in bulk, and it was then subdivided. Frost, who was the capitalist of the firm of Frost & Panchen, put the assets of that firm into the new firm of Frost, Samuel & Co., being $6,990.49 in cash, and notes and accounts, run-.

ning the amount to $20,872.96; for this he took $20,000 of the bank stock, and was paid the balance of $872.96.  He afterwards took $2,500 more of the stock, but how it was paid for does not appear  Samuel took $10,000 of the stock, and gave his note with the stock as collateral; one Mrs. Deason took $5,000 of stock, and gave her note therefor; for the balance of the stock, up to $50,000 ($12,500), Frost, Samuel & Co. gave their note.  This was the capital with which the bank organized.  No dividends were ever declared thereafter.  The books showed credits on Samuel's note amounting to $8,800.  As collateral for the stock note of Frost, Samuel & Co., there was also placed $10,-000 of stock in the Carbondale Iron Co.; what its value then was is not shown, but it was sold by the assignee, in 1883, for $3,500, at a somewhat depreciated valuation.  Besides his stock, Samuel owed the bank $11,196.53, and a firm of which he was a member owed it on notes, for debts contracted in the fall of 1879 and in 1880, $36,274.26, and also an account for $26,016.16.   His firm was probably insolvent, then.  Frost resides in Mississippi, Houston in Ohio.  The latter never put any money into the bank, nor did Mrs. Deason ever pay anything; nor were other payments made than those already stated. Brower, before the transfer, issued a circular to his patrons, stating that the business of the bank would be brought to a close on February 20, 1879, and depositors and creditors were requested to present their claims.  After the transfer to Frost, Samuel & Co., he occupied, by their permission, a back room in the bank-building, and paid off all claims accruing up to the time of the transfer. He advertised the transfer of his stock to that firm.  It was generally known that he had sold out to Frost, Samuel & Co., and had retired from the business, but the particulars as to the withdrawal of the assets were not generally known.

Brower gave the following account of the transaction between him and Frost, Samuel & Co.: "I owned the en-

tire stock of the bank, and treated the entire assets as my own   In January or February, 1879, I went to Col. Samuel and proposed to sell him the bank building.   He told me he had formed a partnership to succeed Frost & Panchen,. who were doing business up the street, and when the contract was drawn, he gave me the name of Frost, Samuel & Co.   I had concluded to close out, and prepared a circular to that effect and sent it to all the customers of the bank.. Colonel Samuel stated to me that they would rather do business under a charter, and that they could get one, but that he would like for me to transfer this one to him.   I. told him I didn't know whether I could do so without liability to me.   He represented to me that he was going to do a large business; that he would bring in stronger men and do a larger business than we had done.   I told him that I was: going out of the business, and I didn't want any anxiety about it.   I told him that I would submit it to my attorney in the matter, Colonel Alexander, and if he said it could be done without liability to me, I would then do it as a. favor, no consideration being asked   I did submit it to Colonel Alexander, and he told me that I could do it.   He said that the proper and legal way was to transfer all the stock to this concern, and then receive the assets back, although the assets never were to go to them.   I simply transferred the charter to them.   They never had the assets of the bank, nor any of them   They never saw them, and never had anything in the world to do with them.   All that I did, and all that I intended to do, was to sell the bank building and furniture.   My attorney wrote the paper signed by Frost, Samuel & Co.   At the time of this transaction, I owned all the stock and assets of the bank.   No other person had any interest in it.   After I got done closing it up, it owed nobody anything.   I paid all its debts,. and there is now no debt against it.   If the bank created any debts afterwards, I had nothing to do with it.   I never was afterwards connected with the bank as stockholder or officer of any kind."

There was other evidence as to the solvency, safety and business standing of Frost & Panchen and of Frost, Samuel & Co., which was in some degree conflicting. On behalf of the complainant, there was testimony that the parties were not safe and careful in their management; that the firm of Frost & Panchen at one time had trouble about their exchange; that the affairs of the bank were recklessly managed; that the bank is now insolvent; and that an effort to realize out of Frost has proved futile; while, on behalf of the defendant, Panchen testified that at the time of the transfer from Brower, he considered that Frost, Samuel & Co. were solvent, and that the bank was solvent, and remained so until March, 1881, when the failure of Gowan & Samuel to meet their obligations caused it to fail. The bank became a state depository in November, 1879. It failed in March, 1881, owing from $150,000.00 to $200,000.00, and with assets not above $40,000.00. Brower testified that the bank did a large business, but in about six months after the transfer, he thought it unsafe.

The jury found for the defendant. Complainant moved for a new trial, on the following grounds:

(1.) Because the verdict is against the evidence, is against the weight of the evidence, and is without evidence to support it.

(2.) Because the verdict is contrary to law, and is contrary to the principles of justice and equity.

(3.) Because the court refused the following charge: " A stockholder has no right to withdraw from a corporation any of its capital stock until the corporation is legally dissolved."

(4.) Because the court refused the following charge: " If the defendant sold all the stock of the Bank of Rome to Frost, Samuel & Co., they, Frost, Samuel & Co., owed Brower for it; and Brower had no right, after the sale, to retain the assets of the bank, and if he did so, and the bank has since become insolvent, then the assignee would

have the right to recover of Brower such assets or their value."

(5.) Because the court charged as follows: "If it was agreed upon that the transfer of the stock and charter should only carry the naked stock and charter, and that the assets should not go with the stock and charter, then the assets would not pass with the transfer of the stock and charter."

(6.) Because the court charged as follows: "If the object and intent of Frost, Samuel & Co., in taking the transfer of the stock, was to defraud such creditors as they might thereafter have, and if they were then insolvent, and did not intend to replace the stock at the time they took it, and have not done it, and if Brower knew all this at the time, and he made such transfer to enable Frost, Samuel & Co. to commit such a fraud, he would be liable for any loss occasioned by such conduct, in a proper suit for its recovery, but would not be liable in this case on this ground."

(7.) Because the court charged as follows: "If Frost, Samuel & Co. replaced in the new organization stock of equal value with the assets retained by Brower, then the plaintiff could not recover on account of any alleged withholding or withdrawal of any assets of the old organization, or on account of the transfer of the naked stock alone."

(8.) Because the court charged as follows: "If Brower was sole owner of all the stock of the old organization, he was then the sole owner of all its property of every kind."

(9.) Because the court charged as follows: "If Brower was not interested in the new organization, and if he was the sole owner of all the stock and assets of the old organization, and closed out its business and paid its existing debts at the time he closed out its business, or afterwards, and quit business; and if, after selling the bank building to Frost, Samuel & Co., he made them a gift of the bank

charter in good faith, and with no intent to defraud the public, receiving no consideration for it, and if the sole object of transferring the stock of the old organization to Frost, Samuel & Co. was to transfer the charter of the bank to them, and if, after it was transferred to them, they re-organized the bank, and were charged on their books with the $50,000.00 capital stock—divided it out among themselves, Samuel taking ten thousand, Frost twenty-two thousand five hundred dollars, De son five thousand, and Frost, Samuel & Co. the balance, and if they paid up such stock in money in part and gave their notes for the balance of it, and if the assets of the old organization were retained by Brower by the contract of the parties, and were not to be, and were not in fact transferred and delivered to Frost, Samuel & Co., then the plaintiff could not recover, whether the effect of such an arrangement was to transfer the charter or not."

(10.) Because the court charged as follows: " If Brower owned the stock of the old organization, and also its assets, and had closed out its business and paid its debts, and if he transferred the stock alone without the assets to Frost, Samuel & Co. in good faith, and with no intent to defraud the public, and Frost, Samuel & Co. re-subscribed the stock and put into the bank a new banking capital, then if Brower advertised such sale of his stock once a month for six months after such transfer, and immediately thereafter, in two newspapers in or near the place where the bank kept its principal office, then the plaintiff would not be entitled to recover."

(11.) Because the court charged as follows: " The assignee only acquired the property and rights of the assignor, and you will look into the evidence and see who the assignor was, whether it was the old organization at the time Brower owned the bank, or whether it was the new organization   If it was the new organization, then Mr. Fouché, the assignee to whom they have conveyed all their property and all their rights, would have

no more right to sue than they would, and unless they could recover in a suit in this court against Brower, he could not recover; and I charge you that the new organization in such case would have no right, if Brower had only conveyed the naked stock and charter to them, to sue Brower for their assets."

(12.) Because the court allowed the witness, Brower, to testify as follows: " Colonel Samuel said to me that they had rather do business under a charter, but said, as this one would be of no further use to me, as I was going out of business, he would like for me to transfer it to him. He represented to me that he was going to do a large business—would bring in stronger men and do a larger buiness than we had done. I told him I would submit it to my attorney, Colonel Alexander, and he told me I could do it. He said the proper and legal way was to transfer all the stock to this concern and receive it back, although it never was to go to them, and all that I did in that transaction, and all that I intended to do, and all that was agreed upon between me and Colonel Samuel, was to sell the bank building and furniture."—Objected to by complainant's counsel, upon the ground that it was hearsay evidence, and because it was parol testimony in contradiction of a contract which was in writing.

(13.) Because the court allowed the witness, Alexander, to testify as follows: " When he (Brower) was winding up the business of the concern, he consulted me about the business, and the purpose and object was to transfer to Frost, Samuel & Co. the charter of the Bank of Rome, in order that they might go on and do the business of the Bank of Rome. For the purpose of effecting the transfer, I wrote the transfer in this form; and in effecting the object which was in view, I wrote the paper effecting the transfer, which was the transfer of the charter of the concern. That seemed to be agreeable to Brower. It was certainly what Samuel wanted; and there seemed to be

no trouble, and it was done simply in order to effect it."— The objection was that the contract was in writing.

The motion was overruled, and complainant excepted.

DABNEY & FOUCHE, for plaintiff in error.

ALEXANDER & WRIGHT; C. N. FEATHERSTON; W. W. BROOKS,-for defendant.

HALL, Justice.

Has the complainant in this bill, who, by appointment of the court of equity, succeeds the original assignee named under à voluntary assignment made by the Bank of Rome, a right to maintain this suit, either under the terms of that assignment or by virtue of any provision of law, against the defendant, on account of a collusive arrangement charged to have been entered into between him and those to whom he sold the bank, and who afterwards re-organized it as its stockholders, directors and other officers, whereby the creditors and others dealing with the corporation were alleged to have been defrauded and injured? The question for our consideration is, not whether the creditors of this insolvent corporation can maintain a suit against this defendant for his participation in this alleged fraud, which it is insisted has resulted in loss and injury to them, but whether its voluntary assignee has authority to institute and carry on such a suit for their benefit.

1. As to this right of creditors against this defendant, we express no opinion, further than to say that courts will always lend them aid as a favored class, and will afford them every facility and remedy to detect, defeat and annul every effort to defraud them of their just rights. Code, §1945. But were this a suit at their instance, to accomplish this object, we would not be able, on account of the defective frame of the bill, to afford the remedy sought. It sets out neither the character and nature of their respective claims, the amounts thereof, nor the circumstances under

which they arose; it is not shown that the fraud charged was known to each of them, that they severally became creditors in consequence of the false representations, or how and in what manner any one of them was imposed upon and misled thereby to his injury and damage, if so imposed upon at all, all of which statements would be essential to the maintenance of the suit at the instance of either one of them. The fraud complained of, if it existed, does not appear to be such as necessarily affected all of them alike, but it may or may not have induced each individual creditor to act according to the facts as presented in his particular case. One may have been induced to deal with the bank on account of the false appearances created by this imputed fraud, while another may have dealt with it irrespective of any such facts and without any knowledge of their existence. It is essential to an action on account of a wilful misrepresentation of a fact made to induce a party to act, that he should have acted upon it to his injury. Code, §§2958, 3174; *Wright vs. Zeigler Bros.*, 70 *Ga.*, 501. The precise question was before the Supreme Court of the United States in Scovill *vs.* Thayer, 105 U. S., 151, where it was said that " a creditor, who has been defrauded by misrepresentations of the real capital of the company, has his remedy in an action of tort against all who participated in the fraud. But the wrong done him cannot entitle the entire body of creditors, who have not suffered from the alleged fraud, to recover of the entire body of stockholders who have taken no part in it." Each case stands in this respect upon its own particular circumstances. And even where the suit is prosecuted for creditors by a receiver, acting under appointment from the court, it is essential that the pleadings set forth the facts entitling each of the creditors to maintain his action. High on Receivers, §201 and citations. It is well to remark that, in this respect, there is no difference in proceedings in courts of law and courts of equity.

2. A bank has much the same rights to make an assign-

ment that others have; whenever it "surrenders its charter, or the use thereof, it may make, in good faith, an assignment of all its effects for the payment of its debts, as natural persons may, but it cannot thereby prevent such preference among its creditors as the law gives," (Code, §1493); and this condition as to preferences given by law, we may add, is as true in the case of assignments made by natural as by artificial beings. Like other trusts, this is not allowed to fail for the want of a trustee to carry out its provisions; it cannot be defeated, provided it was valid when made, for the want of an assignee, but the court in "vacation or term time is authorized to appoint a receiver who shall execute the assignment." *Ib.*, §1495. The duty of this receiver, when appointed in place of the assignee, is such only as the assignee was bound to perform, viz., to execute the assignment; therefore the complainant stands in the shoes of Reynolds, the party to whom the bank assigned, with all his rights, privileges and powers, but with none others, either greater or less. The receiver thus appointed is, to all legal intents and purposes, *quoad* the assignment and its execution, the original assignee.

3. It is urged that the assignor, which is the bank, was not a participant in, but the victim of, the fraud charged in this particular instance; that the transaction out of which the fraud grew was exclusively between the defendant and Frost, Samuel & Co., to whom the defendant sold the banking house and assigned the charter, with all the rights and privileges of carrying on banking business according to its provisions; and that the defendant, before the re-organization of the corporation under the assigned charter, had drawn out of the bank all of its available assets and appropriated to his own use property which had belonged to it, amounting to some $40,000. But it should be remarked that this sale was made by the defendant to these parties after he had wound up the transactions of the bank, while it was under his management, and with a view to his

abandoning the business. It was consummated before the parties re-organized the bank; they well understood what the defendant was selling them, and what they were buy-ing. It does not appear that the defendant participated in this re-organization, or that he had any interest in the new concern, or was engaged in any way, or to any extent, in the management of its affairs, or that he held himself out, or suffered others to hold him out, to the public as having any connection whatever therewith; in fact, his card to the public, recommending the new organization and ask-ing business for it as the successor of the one he controlled, distinctly announced the fact that he had severed his con-nection with it. Neither does it appear from any state-ment in the pleadings that Frost, Samuel & Co. misrepre-sented to their associates in this fresh venture the terms and conditions on which the value or character of the assets they had acquired from the defendant by the con-tract they made with him depended; on the contrary, it is evident that they were themselves the principal, if not, with trifling exceptions, the only stockholders, as well as the officers and managers of the bank. If others had any stock, it must have been quite a small amount, and it does not appear whether they acquired it by purchase or by gift from Frost, Samuel & Co. Besides, the pleadings contain no intimation that these additional stockholders were induced to become such by misrepresentations made to them as to the value or condition of the capital stock of the bank. Frost, Samuel & Co. appear to have been the bank itself; the other stockholders adopted what they did, and do not seem to have dissented from their action in any respect. For a time the bank did a profitable and lucrative business, and the bill charges that its insolvency was, in a great measure, occasioned by their withdrawing from it deposits made by customers, for their private purposes, and on account of individual speculations to the amount of $75,000. It does not appear, however, that defendant had anything to do with this misappropriation of its assets.

It is not easy to conceive how this invisible, intangible body could act automatically and independently of the agency of its members in conducting its operations, or how the body thus constituted could exist without the aid of its members. The attempt to separate the two and relieve the one from responsibility for the actions of the others is, in a legal sense, incomprehensible. The corporation can only act by and through its members and appointed agents; their action is necessarily its action, and the attempted distinction would seem to have no existence either in fact or in law.

4. The idea that a voluntary assignee can maintain suits for the benefit of creditors for whom he holds in trust the effects assigned, which the assignor could not maintain, is of modern origin; certain it is that he cannot do this according to the well-established principles of the common law. That he may do it by special enactments in some of the states and by virtue of certain provisions made by particular laws of the United States, is not questioned. We are constrained, however, to hold that no such authority is, either directly or impliedly, conferred upon the assignee by any statute of this state. The act requiring a sworn schedule to be attached to the assignment, if it warranted the inference sought to be drawn from it, to which we are unable to agree, was passed subsequently to the execution of this assignment, and is therefore not applicable to it. The only power that the assignee has, as already shown, is to "execute the assignment," and that the assignor can assign no right or title with which he has parted prior to the execution of his deed (and consequently that he cannot include this in the sworn schedule annexed thereto), will be abundantly shown in this judgment. Neither can we see how we can confer upon a voluntary assignee or his successor in the assignment, even though such successor derives his authority to act by appointment of the court, the enlarged powers given to a receiver appointed to collect and distribute the assets of an insolvent

bank upon a judgment of the court forfeiting its charter. This is a distinct authority from that growing out of a voluntary assignment; different principles apply to the two cases. In *Dobbins vs. Walton and another, assignees, etc.*, 37 *Ga.*, 614, this court held that the sections of the Code regulating the collection and distribution of the assets of a bank by a receiver appointed upon a judgment forfeiting its charter, did not apply in the case of a voluntary assignment by the bank of its assets to pay its debts according to the requirements of law

5. That parties who have combined to defraud others cannot invoke the aid of a court to enable them either to enforce or to rescind such an arrangement is well settled; "*ex turpi causa actio non oritur,*" and "*in pari delicto melior est conditio defendentis,*" are maxims long established and constantly acted upon both by courts of law and equity. One is simply the complement of the other, and the principle of both is embodied in our Code, §3093. Together they announce a principle which, as has been well said, " commends itself no less to the moralist than the jurist, for there is no obligation upon any one to extricate a rogue from his own toils. On any other principle, a knave might gain, but could not lose, by a dishonest expedient, and inducements would be furnished to unfair dealing, if the law were to repair the accidents of an unsuccessful trick. A fraudulent grantee, therefore, is allowed to retain the property, not for any merit of his own, but for the demerit of his confederate, in accordance with a wise and liberal policy, which requires that the consequences of a fraudulent experiment shall be made as disastrous as possible. The law endeavors to environ a debtor with all possible perils, and make it appear that hone-ty is the best policy." Bump Fraudulent Con., 3d ed., 1882, pp. 443, 444. Such being the policy of the law, and every facility being afforded a creditor or other party defrauded to impeach and set aside such transactions, and an assignee, as is an executor or administrator, being regarded as a trustee, not only for the

assignor in one instance, and the testator or intestate in the other, but a¹so for creditors and others having claims upon either estate, it would not seem illogical or improper, in order to carry into effect this just and righteous policy, to invest the assignee or executor, or administrator, with the powers essential to the preservation and protection of every right conferred upon each class of his *cestuis que trust*, the creditors as well as those from whom the capacity to act is derived. Such a grant of power would, we are satisfied, not only serve to prevent fraud, but would dispense with quite a multiplicity of suits, and tend both to terminate and to diminish litigation. But however desirable this exercise of authority might be upon the part of an assignee or administrator, or others who hold fiduciary relations to both debtor and creditor, it has been so long and so uniformly denied, that we could not venture to assume its exercise unless it were expressly authorized by the lawmaking power, to which we most respectfully refer the question in all its various bearings.

"A fraudulent transfer," says Bump, pp. 444, 445, 446, "is good as against the grantor, his heirs, executors, administrators, agents, parties claiming under him, and his vendees and grantees. A fraudulent receipt to a person who owes money to the debtor is as binding as any other transfer." The array of cases cited by him in the notes sustaining these positions is overwhelming. Again, the same careful and reliable compiler, on p. 484 of the same work, says, "If the debtor subsequently makes an assignment, the creditors may still have the fraudulent transfer set aside, for he cannot transfer any right to his assignee which he himself does not possess." This is likewise sustained by numerous cases cited in note 5.

"In general, a receiver, by virtue of his appointment, is clothed with only such rights of action as might have been maintained by the persons over whose estate he has been appointed and to whose rights for purposes of litigation he has succeeded." High on Receivers, §§201, 205, and cita-

tions.   The same rule as to the receiver's or assignee's right of action has been followed by our own court in several instances,—66 *Ga.*, 609, 615, where it is laid down in terms, as it had been previously in 37 *Id.*, 614, 619, that one acting as assignee, under a voluntary deed of assignment for the benefit of creditors, stands as to suits "in no better situation than the assignor." The same principle is recognized, though somewhat differently applied, in *Moise vs. Chapman*, 24 *Ga.*, 249.   The right of action belonging to the creditors, if to any one, against the defendant in this case constituted no part of the rights or assets of the bank, as we have seen, and consequently could not pass under its assignment to the complainant.   This phase of the case is fully met and covered by the judgment in *Lane vs. Martin*, 8 *Ga.*, 468, where it is said, "the right given the bill-holder to go upon the stockholder for the ultimate redemption of the bills is independent of any claim upon the assets of the corporation, one which may be asserted directly and in his own name, and which the assignee or receiver could not enforce, as it constitutes no part of the assets of the bank."   In this case, the bank has failed, and its assets were in the hands of a receiver, who had been appointed by an act of the general assembly.   On the general question, see Brownell *vs.* Curtis, 10 Paige, 210; Osborne *vs.* Moss, 7 Johns. R., 161; Dorsey *vs.* Smithson, 6 Harris & Johns., 61; Hyde *vs.* Lynde, 4 N. Y., 387, 392; Bostwick *vs.* Menck, 40 N. Y. (1 Hand), 383; Thompson *vs.* Dougherty, 12 S. & R. (Penn.), 448; Yeatman *vs.* Savings Inst., 95 U. S., 764, 766, especially last cited page; Donaldson *vs.* Farwell, 93 *Id.*, 631, particularly last paragraph of opinion; Jones *vs.* Yates, 9 Barn. and C. (17 Eng. C. L., 241) 532, 538, 539, 540, where the court, per Lord Tenterden, Chief Justice, say, in a case where assignees in bankruptcy were the plaintiffs, they "are not aware of any instance in which a person has been allowed as plaintiff in a court of law to rescind his own act, on the ground that such act was a fraud upon some other person:" that

what the party himself could not do, his assignees cannot; and that the only case in which the assignees may recover property which the bankrupt could not, is where the property upon the eve of bankruptcy was conveyed in fraud of the bankrupt law.

Several cases have been cited by the complainant which are supposed to authorize this suit, especially Casey vs. Cavaroc, 96 U. S., 475, and Pillsbury vs. Kingon, 33 N. J. Eq., 287. Upon examination, however, it will be found that each case rests upon the peculiar provisions of statutes specially intended to confer the power upon assignees to maintain such for suits causes of action; they are therefore not in conflict with the general rule, but have been taken out of its operation by virtue of the legislation designed to enlarge it so as to embrace the cases theretofore excluded from it. It is true that the reasoning of the court in the last case goes very far to abrogate the rule itself, and it may perhaps be fairly inferred that the result would have been the same had there been no legislative enactment expressly or impliedly authorizing it. The court, however, puts the case squarely upon the act of the New Jersey legislature. That act applies not only to suits by assignees, but to those by executors and administrators, and authorizes them to impeach transactions for fraud, wherever the creditors of the assignor or of the decedents could have done so.

In the strictly analogous case of fraud committed by the deceased in his lifetime, it has been held that while his creditors might set the transaction aside on that account, the executor or administrator could not do so in any case where the testator or intestate had no authority to bring an action. Our own decisions are full upon the question, and will dispense with the necessity of citing others from the English authorities and from nearly all the states of the Union. *Crosby vs. DeGraffenreid*, 19 *Ga.*, 290; 20 *Id.*, 452, 464, 465; 22 *Id.*, 431. For a full and

able discussion of the question by Law. Judge, see *R. M. Charlton's R.*, 383, 388.

Such being our view of the law applicable to this case, the verdict sought to be set aside could have been no other than it was. It is not binding upon the creditors of the bank or others having claims against it on account of the alleged fraudulent dealings between the defendant and those who became its owners and managers; and as to any rights they have against the defendant on this account, the voluntary assignee of the bank was not their trustee and had no authority to act for them in that behalf. This suit, as to them, is to all intents and purposes a suit between strangers; it is *res inter alios acta*. On this ground alone, and without any reference whatever to the other questions made upon the trial, which we have not considered, and as to which we express no opinion, we ratify the action of the superior court and order its judgment affirmed.